**JODI D. THORP**
California Bar No. 223663
427 "C" Street Suite 300
San Diego, California  92101
Telephone:  (619) 233-3169 ext. 14
jodithorp@thorplawoffice.com

Counsel for Mr. Motivosyan

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE ROGER T. BENITEZ)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | U.S.D.C. No. 08CR1455-BEN |
| Plaintiff, | ) | Date: June 30, 2008 |
| v. | ) | Time: 2:00 p.m. |
| ARSEN MOTIVOSYAN, | ) | |
| Defendant. | ) | **STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS** |

**I.**

**STATEMENT OF FACTS**[1]

On April 26, 2008, without reasonable suspicion, a border patrol agent stopped a car with three passengers of Armenian origin.  Mr. Motivosyan was a passenger in the car.  The border patrol agent indicated that he stopped the car because it was in an area near the border and the occupants to the car were seen throwing out trash, including receipts and bank statements.  Despite being stopped illegally, the car occupants were cooperative and yielded to border patrol.  The agent identified himself as border patrol and conducted an immigration inspection.  All three people in the car provided their valid immigration documents, which the agent inspected and determined were valid.

---

[1] This statement of facts is taken in part from the criminal complaint, indictment, and discovery provided by the government.  Mr. Motivosyan does not adopt all of these facts and reserves the right to challenge these facts at any future proceeding.

Despite having seen the valid immigration documents, the border patrol agent continued to detain the car and its passengers and called for back up. As a "back-up agent," Agent Stallings waited at the passenger side rear of the vehicle until the first agent had finished his "immigration inspection." Both officers were in uniform and armed. Then, without providing any <u>Miranda</u> warnings, the officer began questioning the car passengers. Although it is not clear who the agent alleges responded to the question, one of the passengers allegedly stated in English that they were going to ride horses. At some point after questioning, the agents released the car and its passengers.

About two hours later, the second agent saw the people from the earlier stop walking in Border Field State Park. Thirty minutes later, near the entrance to that same park, the agent saw the car that was stopped earlier with four doors open. This led the agent to believe four people were trying to get into the car. The agent stated that he was "suspicious" that there were four people instead of three. The agent again approached the four people who were sitting on a log and performed an immigration stop on all four people, including the three people who had already cleared the immigration stop with him earlier that day. The agent again verified that three people had valid immigration documents. However, the fourth person only had a California Drivers License on him.

The agent continued to detain all four people, asking them if they remembered him earlier. Three people nodded yes. At that point all three people allegedly made statements in English about the fourth person and what they were doing in the park; however, it is unclear who made what statement. The fourth person indicated he was here on asylum from Armenia. The agent requested to search the car where belongings of the material witness were present. After searching the car, records checks revealed that the fourth person was denied asylum in January of 2008.

All four people were arrested. After being advised through an Armenian attorney that he had the right to an attorney, Mr. Motivosyan requested counsel and did not make any further statements.

Mr. Motivosyan and two others were indicted by the January 2007, grand jury on charges of Conspiracy to Transport and Attempted Transportation under Title 8 USC Sections 1324(a)(1)(A)(ii) and (v)(II).

## II.

### THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING Mr. Motivosyan OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY[2]

### A.    Introduction.

The indictment in the instant case was returned by the January 2007 grand jury. That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007. See Reporter's Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A. Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[3] These instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A. See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached

---

[2] In United States v. Martinez-Covarrubias, Case No. 07CR0491-BTM, Judge Moskowitz found there was error but that it was not structural. If this Court again finds that there was error, but that the error was not structural, this Court must determine whether the error was harmless in this case. Ms. Motivosyan asks that this Court order the government to produce the transcripts of the grand jury proceedings that resulted in the instant indictment. The Court may order disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The Ninth Circuit requires a "particularized need" to justify disclosure, see United States v. Walczak, 785 F.2d 852, 857 (9th Cir. 1986), but that need cannot be any different than the standard set for in Rule 6(e)(3)(E)(ii): Mr. Motivosyan need only show that "a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added). That is why the Rule's "general suggestion [is] in favor of disclosure." See Walczak, 785 F.2d at 857. Here, it is clear that, at the very least, "a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).

[3] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

1  hereto as Exhibit B.[4]

2  **1.    Judge Burns Instructed Grand Jurors That Their Singular
3        Duty Is to Determine Whether or Not Probable Cause Exists
       and That They Have No Right to Decline to Indict When the
       Probable Cause Standard Is Satisfied.**

4        After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

5  responsibility, see Ex. A at 3, 3-4, 5,[5] Judge Burns instructed the grand jurors that they were forbidden "from

6  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

7  federal la w or should not be a federal law designating certain activity [as] criminal is not up to you." See id.

8  at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

9  judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

10  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

11  be insufficient.'" See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

12  because the grand jurors disagree with a proposed prosecution.

13        Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

14  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

15        I've gone over this with a couple of people.  You understood from
16        the questions and answers that a couple of people were excused, I
       think three in this case, because they could not adhere to the
17        principle that I'm about to tell you.

18  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

19  disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

20  view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

21        Examination of the voir dire transcript, which contains additional instructions and commentary in

22  the form of the give and take between Judge Burns and various prospective grand jurors, reveals Judge Burns's

23

24  ───────────────

25        [4]  The transcript of the voir dire indicates that grand jurors were shown a video
       presentation on the role of the grand jury.  Mr. Motivosyan requests that the video presentation
26        be produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he
       proceedings before the grand jury are secret, but the ground rules by which the grand jury
27        conducts those proceedings are not.").

28        [5]  See also id. at 20 ("You're all about probable cause.").

1  emphasis on the singular duty to determine whether or not probable cause exists, and his statement that grand

2  jurors cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous

3  series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, Judge

4  Burns makes clear that the grand jury's sole function is probable cause determination.

5         [T]he grand jury is determining really two factors: "do we have a
   reasonable belief that a crime was committed? And second, do we
6         have a reasonable belief that the person that they propose that we
   indict committed the crime?"

7

8         If the answer is "yes" to both of those, then the case should move
   forward. If the answer to either of the questions is "no," then the
   grand jury should not hesitate and not indict.

9

10  <u>See</u> Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

11  term is employed to convey instruction: "should" cannot reasonably mean optional when it addresses the

12  obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has

13  no "reasonable belief that the person that they propose that we indict committed the crime."

14        Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that,

15  in some unknown set of circumstances, they might decline to indict even where there was probable cause.

16  Because of the redactions of the grand jurors' names, Mr. Motivosyan will refer to them by occupation. One

17  is a retired clinical social worker (CSW), and the other is a real estate agent (REA). The CSW indicated a

18  view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of

19  resources. <u>See id.</u> at 16. The CSW was also troubled by certain unspecified immigration cases. <u>See id.</u>

20        Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

21  CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

22  district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

23  Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were

24  simply not capable of expression in the context of grand jury service.

25         Now, the question is can you fairly evaluate [drug cases and
   immigration cases]? Just as the defendant is ultimately entitled to
26         a fair trial and the person that's accused is entitled to a fair appraisal
   of the evidence of the case that's in front of you, so, too, is the
27         United States entitled to a fair judgment. If there's probable cause,
   then the case should go forward. *I wouldn't want you to say,* "well,
28         yeah, there's probable cause, but I still don't like what our

> government is doing.  I disagree with these laws, so I'm not going
> to vote for it to go forward."  If that is your frame of mind, the
> probably you shouldn't serve.  Only you can tell me that.

See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See id.  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it."  See id.  Again, Judge Burns's question provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination
> shouldn't concern you in the sense that penalties or punishment,
> things like that -- we tell trial jurors, of course, that they cannot
> consider the punishment or the consequence that Congress has set
> for these things.  We'd ask you to also abide by that.  We want you
> to make a business-like decision of whether there was a probable
> cause. . . .

Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."

You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.

That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
REA: It would depend on the case.
The Court: Is there a chance that you would do that?
REA: Yes.
The Court: I appreciate your answers. I'll excuse you at this time.

Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[6]

---

[6] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances"

See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

### 2. The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.[7]

_____

before it has been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances." See id.  This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

[7] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys.  See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B.     Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[8] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

---

[8]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1  II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

2  deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

3  as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510

4  (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

5  I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

6  prosecutorial.").  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

7  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but

8  also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

9  prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of

10  the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

11  "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

12  that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure

13  § 15.2(g) (2d ed. 1999)).

14       Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

15  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

16       The grand jury thus determines not only whether probable cause
         exists, but also whether to "charge a greater offense or a lesser
17       offense; numerous counts or a single count; and perhaps most
         significant of all, a capital offense or a non-capital offense -- all on
18       the basis of the same facts.  And, significantly, the grand jury may
         refuse to return an indictment even "'where a conviction can be
19       obtained.'"

20  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

21  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

22  not only the initial decision to indict, but also significant questions such as how many counts to charge and

23  whether to charge a greater or lesser offense, including the important decision whether to charge a capital

24  crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II

25  majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

26  to indict someone even when the prosecutor has established probable cause that this individual has committed

27  a crime."  See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J.,

28  dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

1  dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

2  But not in Judge Burns's instructions.

3  **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established in Both *Vasquez* and *Navarro-Vargas II*.**

4

5       The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

6

7  in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every

finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at

8

9  1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably

pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use

10

11  of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand

jurors, and thus to circumscribe the grand jury's constitutional independence.").  See also id. ("The 'word'

12

13  should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide

1579 (1999) (brackets in original)).

14

15       The debate about what the word "should" means is irrelevant here; the instructions here make no

such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

16

17  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

18

19  indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9.  Thus, the instruction flatly

bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror

20

21  would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez,

474 U.S. at 264.

22

23       While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that he could only

24

25  mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns not

only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

26

27  probable cause, "then the grand jury should hesitate and not indict." See id. at 8.  At least in context, it would

strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand

28

1  jury to [indict] if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly he was not.

2      The full passage cited above effectively eliminates any possibility that Judge Burns intended the

3  Navarro-Vargas spin on the word "should."

4              [T]he grand jury is determining really two factors: "do we have a
                reasonable belief that a crime was committed?  And second, do we
5              have a reasonable belief that the person that they propose that we
                indict committed the crime?"

6
                If the answer is "yes" to both of those, then the case should move
7              forward.  If the answer to either of the questions is "no," then the
                grand jury should not hesitate and not indict.

8  See Ex. B at 8.  Of the two sentences containing the word 'should," the latter of the two essentially states that

9  if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e]

10  room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at

11  1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting

12  the innocent.   See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

13  "responsibilities continue to include both the determination whether there is probable cause and the protection

14  of citizens against unfounded criminal prosecutions.") (citation omitted).

15      By the same token, if Judge Burns said that "the case should move forward" if there is probable

16  cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

17  Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

18  two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

19  been his intent.  But even if it were, no grand jury could ever have had that understanding.[9]  Jurors are not

20  presumed to be capable of sorting through internally contradictory instructions.  See generally United States

21  v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

22  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

23      Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

24  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

25

26  ─────────────

27      [9] This argument does not turn on Mr. Motivosyan's view that the Navarro-
    Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.
28  Rather, it turns on the context in which the word is employed by Judge Burns in his unique
    instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1    (1)    The first occasion occurred in the following exchange when Judge Burns conducted voir

2    dire and excused a potential juror (CSW):

3    > The Court: . . . If there's probable cause, then the case should go
>    forward. I wouldn't want you to say, "Well, yeah, there's probable
4    > cause. But I still don't like what the government is doing. I
>    disagree with these laws, so I'm not going to vote for it to go
5    > forward." If that's your frame of mind, then probably you shouldn't
>    serve. Only you can tell me that.
6    > Prospective Juror: Well, I think I may fall in that category.
>    The Court: In the latter category?
7    > Prospective Juror: Yes.
>    The Court: Where it would be difficult for you to support a charge
8    > even if                you thought the evidence warranted it?
>    Prospective Juror: Yes.
9    > The Court: I'm going to excuse you then.

10    See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective

11    juror. Even if the prospective juror did not like what the government was doing in a particular case, that case

12    "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I

13    wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment

14    was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

15    the exercise of discretion by any other prospective grand juror.

16    (2)    In an even more explicit example of what "should" meant, Judge Burns makes clear that

17    it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

18    Court    . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

19    > You'd have a similar *obligation* as a grand juror even though you
>    might have to grit your teeth on some cases. Philosophically, if you
20    > were a member of Congress, you'd vote against, for example,
>    criminalizing marijuana. I don't know if that's it, but you'd vote
21    > against criminalizing some drugs.

22    > That's not what your *prerogative* is here. Your prerogative instead
>    is act like a judge and to say, "All right. This is what I've got to deal
23    > with objectively. Does it seem to me that a crime was committed?
>    Yes. Does it seem to me that this person's involved? It does." *And*
24    > *then your obligation, if you find those things to be true, would be to*
>    *vote in favor of the case going forward*.

25    Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives

26    were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were

27    convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded:

28

"It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

(3)      As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

(4)      And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court: In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court: Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized consideration of penalty information.  See 474 U.S. at 263.

Nothing can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Court held in Vasquez:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").  Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See id. at 264.  Judge Burns's grand jury is not Vasquez's grand jury.  The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding."  See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must therefore be dismissed.  Id.

1    The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the

2  instructions' excesses.   The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its

3  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

4  decisions." 408 F.3d at 1200.   As a result, the majority discounts the effect that a judge's instructions may

5  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

6  independent."  <u>Id.</u> at 1202 (emphases in the original).

7    Judge Hawkins sharply criticized this approach.   The majority, he explains, "believes that the

8  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

9  of many of its decisions -- sufficiently protects that power."  <u>See id.</u> at 1214 (Hawkins, J., dissenting).   The

10  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

11  making a probable cause determination ... unconstitutionally undermines the very structural protections that

12  the majority believes save[] the instruction."  <u>Id.</u>  After all, it is an "'almost invariable assumption of the law

13  that jurors follow their instructions.'"  <u>Id.</u> (quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987)).   If that

14  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

15  in <u>Vasquez</u>.   Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

16  instructions because nothing will happen if they disobey them."  <u>Id.</u>

17    In setting forth Judge Hawkins' views, Mr. Motivosyan understands that this Court may not adopt

18  them solely because the reasoning that supports them is so much more persuasive than the majority's

19  sophistry.   Rather, she sets them forth to urge the Court *not to extend* what is already untenable reasoning.

20    Here, again, the question is not an obscure interpretation of the word "should", especially in light

21  of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

22  Court in <u>Navarro-Vargas II</u> because they had not yet been disclosed to the defense, but an absolute ban on the

23  right to refuse to indict that directly conflicts with the recognition of that right in <u>Vasquez</u>, <u>Campbell</u>, and both

24  <u>Navarro-Vargas II</u> opinions.   <u>Navarro-Vargas II</u> is distinguishable on that basis, but not only that.

25    Judge Burns did not limit himself to denying the grand jurors the power that <u>Vasquez</u> plainly states

26  they enjoy.   He also excused prospective grand jurors who might have exercised that Fifth Amendment

27  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  <u>See</u> Ex.

28  A at 8; Ex. B at 17, 28.   The structure of the grand jury and the secrecy of its deliberations cannot embolden

grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned his own rules and enforced them.

**D.      The Instructions Conflict with Williams' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law.  See 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory' judicial authority exists."  See id. at 47.  Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  Id. at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure."  Id. at 50.  As a consequence, Williams rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law.  See id. at 51-55.

Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1) I have to consider evidence that undercuts probable cause.

(2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3) Because no such evidence was presented to me, I may conclude that there is none.

1  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence

2  presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound

3  prosecutor would have presented it.

4        The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

5  prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

6  probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

7  of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

8  the Fifth Amendment.

9                                   **III.**

10                    **THIS COURT SHOULD ORDER PRESERVATION OF EVIDENCE.**

11        Defendant requests the preservation of all physical evidence in this case.  This includes any evidence

12  that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government (or its

13  private contractors) in this case.  United States v. Riley, 189 F.3d 802, 806-808 (9th Cir.1999).  This request

14  includes, but is not limited to: (1) any money seized; (2) the results of any fingerprint analysis; (3) all personal

15  effects; (4) the agents' rough notes; (5) any radio broadcast, if it is recorded, and all tape recordings (5) the

16  car; and (6) any evidence seized from the defendant or any third party (i.e., material witnesses, co-defendants).

17  This request also includes any material or percipient witnesses who is likely to become unavailable.

18  Defendant requests that government counsel be ordered to notify the agencies and private contractors with

19  custody of such evidence be informed of the Court's preservation order.

20                                   **IV.**

21                    **THIS COURT SHOULD COMPEL DISCOVERY.**

22        Mr. Motivosyan moves for the production by the government of the following discovery.  This

23  request is not limited to those items about which the prosecutor knows, but includes all discovery listed below

24  that is in the custody, control, care, or knowledge of any government agency.  See generally Kyles v. Whitley,

25  514 U.S. 419 (1995); United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

26        **1. The Defendant's Statements.**  The Government must disclose to the defendant all copies of any

27  written or recorded statements made by the defendant; the substance of any statements made by the defendant

28  which the Government intends to offer in evidence at trial; any response by the defendant to interrogation;

the substance of any oral statements, whether recorded or not, which the Government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the Government agent; any response to any Miranda warnings which may have been given to the defendant; and any other statements by the defendant. Fed. R. Crim. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements. In this case it is unclear which statements the government is attributing to Mr. Motivosyan and which statements the government is attributing to the other defendants. It is also unclear whether the statements were made in English or Armenian. Thus, Mr. Motivosyan requests clarification.

**2. Arrest Reports, Notes and Dispatch Tapes.** The defense also specifically requests that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances surrounding his arrest or any questioning, if such reports have not already been produced in their entirety, be turned over to him. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. This is all discoverable under Fed. R. Crim. P. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963). See also Loux v. United States, 389 F.2d 911 (9th Cir. 1968). Arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant are available under Fed. R. Crim. P. 16(a)(1)(B) and (C)), Fed. R. Crim. P. 26.2 and 12(i). Preservation of rough notes is requested, whether or not the government deems them discoverable.

**3. Brady Material.** The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case. Impeachment and exculpatory evidence both fall within Brady's definition of evidence favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

**4. Any Information That May Result in a Lower Sentence.** As discussed above, any information which may result in a more favorable sentence must also be disclosed pursuant to Brady v. Maryland, 373 U.S. 83 (1963). The Government must disclose any cooperation or attempted cooperation by the defendant, as well as any information that could affect any base offense level or specific offense

characteristic under Chapter Two of the Guidelines. Also included in this request is any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal history, or any other application of the Guidelines.

**5.**      **The Defendant's Prior Record.**  Evidence of a prior record is available under Fed. R. Crim. P. 16(a)(1)(B).  Counsel specifically requests a complete copy of any criminal record.

**6.**      **Any Proposed 404(b) Evidence.**  Evidence of prior similar acts is discoverable under Fed. R. Crim. P. 16(a)(1)(C)) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. Sufficient notice requires the government to "articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." United States v. Mehrmanesh, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); see also United States v. Brooke, 4 F.3d 1480, 1483 (9th Cir. 1993) (reaffirming Mehrmanesh and reversing convictions).

This includes any "TECS" records (records of prior border crossings) that the Government intends to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal.  Although there is nothing intrinsically improper about prior border crossings, they are nonetheless subject to 404(b), as they are "other acts" evidence that the government must produce before trial.  United States v. Vega, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

The defendant requests that such notice be given three weeks before trial to give the defense time to adequately investigate and prepare for trial.

**7.**      **Evidence Seized.** Physical evidence seized as a result of any search, either warrantless or with a warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(C)).

**8.**      **Henthorn Material.**  The defendant requests that the Assistant United States Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved in the present case for impeachment material.  See Kyles v. Whitley, 514 U.S. 437, 438 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991).  This request includes, but is not limited to, any complaints filed (by a member of the public,

1  by another agent, or any other person) against the agent, whether or not the investigating authority has taken

2  any action, as well as any matter for which a disciplinary review was undertaken, whether or not any

3  disciplinary action was ultimately recommended.  The defendant further requests production of any such

4  information at least one week prior to the motion hearing and two weeks prior to trial.  If the prosecutor is

5  uncertain whether certain information should be disclosed pursuant to this request, this information should

6  be produced to the Court in advance of the motion hearing and the trial for an in camera inspection.

7  **9.      Tangible Objects.**  The defendant requests the opportunity to inspect, copy, and test, as

8  necessary, all other documents and tangible objects, including photographs, books, papers, documents,

9  fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for

10  use in the government's case-in-chief or were obtained from or belong to the defendant.  Fed. R. Crim. P.

11  16(a)(1)(C)).  Specifically, the defendant requests copies of all photographs in the government's possession

12  of the alleged compartment.

13  **10.      Expert Witnesses.**  The defendant requests the name, qualifications, and a written

14  summary of the testimony of any person that the government intends to call as an expert witness during its

15  case in chief.  Fed. R. Crim. P. 16(a)(1)(G).  This summary should include a description of the witness'

16  opinion(s), as well as the bases and the reasons for the opinion(s).  See United States v. Duvall, 272 F.3d 825

17  (7th Cir. 2001) (finding that government's written expert notice did not adequately summarize or describe

18  police detective's testimony in drug prosecution where notice provided only a list of the general subject

19  matters to be covered and failed to identify what opinion the expert would offer on those subjects).  This

20  request includes, but is not limited to, disclosure of the qualifications of any government witness who will

21  testify that she understands and/or speaks Spanish or any other foreign language that may have been used

22  during the course of an interview with the defendant or any other witness.

23  The defense requests the notice of expert testimony be provided at a minimum of two weeks prior

24  to trial so that the defense can properly prepare to address and respond to this testimony, including obtaining

25  its own expert and/or investigating the opinions, credentials of the government's expert and obtain a hearing

26  in advance of trial to determine the admissibility of qualifications of any expert.  See Kumho v.  Carmichael

27  Tire Co., 526 U.S. 137, 119 S.Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must determine,

28  reliability and relevancy of expert testimony and such determinations may require "special briefing or other

proceedings")

**11.**    **Impeachment evidence.**  The defendant requests any evidence that any prospective government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to the defendant.  See Fed. R. Evid. 608, 609 and 613.  Such evidence is discoverable under Brady v. Maryland, supra.  See United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988) (witness' prior record); Thomas v. United States, 343 F.2d 49 (9th Cir. 1965) (evidence that detracts from a witness' credibility).

**12. Evidence of Criminal Investigation of Any Government Witness.** The defense requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.  United States v. Chitty, 760 F.2d 425 (2d Cir. 1985).

**13. Evidence of Bias or Motive to Lie.**  The defense requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or her testimony.  Pennsylvania v. Ritchie, 480 U.S. 39 (1987); United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988).

**14. Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity.**  The defendant requests any evidence, including any medical or psychiatric report or evaluation, tending to show that any prospective witness's ability to perceive, remember, communicate, or tell the truth is impaired; and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic.  United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988); Chavis v. North Carolina, 637 F.2d 213, 224 (4th Cir. 1980).

**15. Witness Addresses**.  The defense requests the name and last known address of each prospective government witness.  See United States v. Napue, 834 F.2d 1311 (7th Cir. 1987); United States v. Tucker, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is ineffective); United States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense has equal right to talk to witnesses).  The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a government witness. United States v. Cadet, 727 F.2d 1453 (9th Cir. 1984).

**16. Name of Witnesses Favorable to the Defendant.** The defendant requests the name of any

witness who made any arguably favorable statement concerning the defendant or who could not identify her or who was unsure of her identity, or participation in the crime charged.  Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968); Chavis v. North Carolina, 637 F.2d 213, 223 (4th Cir. 1980); Jones v. Jago, 575 F.2d 1164,1168 (6th Cir.1978); Hudson v. Blackburn, 601 F.2d 785 (5th Cir. 1979), cert. denied, 444 U.S. 1086 (1980).

17. **Statements Relevant to the Defense.**  The defendant requests disclosure of any statement that may be "relevant to any possible defense or contention" that she might assert.  United States v. Bailleaux, 685 F.2d 1105 (9th Cir. 1982).  This includes Grand Jury transcripts which are relevant to the defense motion to dismiss the indictment.

18. **Jencks Act Material.**  The defendant requests production in advance of th emotion hearing or trial of all material, including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2.   A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1).  Campbell v. United States, 373 U.S. 487, 490-92 (1963); see also United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (holding that interview notes constitutes Jencks material when an agent reviews notes with the subject of the interview); see also United States v. Riley, 189 F.3d 802, 806-808 (9th Cir. 1999).  Advance production will avoid the possibility of delay of the motion hearing or trial to allow the defendant to investigate the Jencks material. Defendant requests pre-trial disclosure of such statements to avoid unnecessary recesses and delays and to allow defense counsel to prepare for, and use properly any Jencks statements during cross-examination.

19. **Giglio Information.**  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, expressed or implied, made to any government witnesses, in exchange for their testimony in this case, and all other information which could arguably be used for the impeachment of any government witnesses.

20. **Agreements Between the Government and Witnesses**.  The defendant requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective government witness and

the government (federal, state and/or local).  This request also includes any discussion with a potential witness about or advice concerning any immigration benefits, any contemplated prosecution, or any possible plea bargain, even if no bargain was made or the advice not followed.

**21.  Informants and Cooperating Witnesses.**  The defendant requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against the defendant.  The government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense.  Roviaro v. United States, 353 U.S. 52, 61-62 (1957).  The government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.

**22.  Bias by Informants or Cooperating Witnesses.**  The defendant requests disclosure of any information indicating bias on the part of any informant or cooperating witness.  Giglio v. United States, 405 U.S. 150 (1972).  Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

**23.  Personnel Records of Government Officers Involved in the Arrest.**  Defendant requests all citizen complaints and other related internal affairs documents involving any of the law enforcement officers who were involved in the investigation, arrest and interrogation of Defendant.  See Pitchess v. Superior Court, 11 Cal. 3d 531, 539 (1974).  Because of the sensitive nature of these documents, defense counsel will be unable to procure them from any other source.

**24.  Training of Relevant Law Enforcement Officers.**  Defendant requests copies of all written, videotaped or otherwise recorded policies or training instructions or manuals issued by all law enforcement agencies involved in the case to their employees regarding the questioning of suspects and witnesses.

**25.  Opportunity to View and Photograph the Evidence Seized.**  Defendant hereby requests an opportunity to view and photograph any evidence allegedly confiscated in this case.

**26.  Residual Request.**  The defense intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States.  This request specifically includes all subsections of Rule 16.  The defendant requests that the government provide him and his attorney with the above requested material sufficiently in

1  advance of trial.

2                                          **V.**

3

4  **THIS COURT SHOULD SEVER MR. MOTIVOSYAN'S  TRIAL FROM THE OTHER DEFENDANTS' TRIALS**

5

6          Here, Mr. Motivosyan moves for severance on the following grounds: 1) the government will

7  likely seek admission of a co-defendant's statement, thus compromising Mr. Motivosyan's Confrontation

8  Clause rights;  and 2)  there is a serious risk that joinder will prejudice Mr. Motivosyan because it is

9  anticipated that Mr. Motivosyan and the others will present mutually antagonistic defenses.

10

11  **A.    To Protect Mr. Motivosyan' Confrontation Clause Rights, this Court Should Sever Because the Government Seeks Admission of the Co-Defendant's  Statements.**

12

13          The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant

14  "to be confronted with the witnesses against him." This guarantee includes the right to cross-examine

15  witnesses. For the purposes of the Confrontation Clause,  a witness is "against" the defendant where his

16  testimony forms part of the evidence that the jury may evaluate in considering his guilt. See Cruz v. New

17  York, 481 U.S. 186 (1987). The testimony of such a witness, however, generally will not be considered

18  "against" the defendant where the jury is given a limiting instruction. See id. at 187. If, after an instruction

19  , the jury can refrain from considering the evidence against the defendant, then the defendant's confrontation

20  rights are not implicated. See id.

21          In Bruton, however, the Court recognized that this general principle does not apply to cases

22  in which the government seeks to introduce incriminating extra-judicial statements of a non-testifying co-

23  defendant in a joint trial, and those statements are not directly admissible against the defendant. Id.  In such

24  a case, limiting instructions are not an adequate substitute for cross-examination. Id. This testimony should

25  not be admitted because "the risk that the jury will not, or cannot, follow instructions is so great, and the

26  consequences of failure so vital to the defendant, that the practical and human limitations of the jury system

27  cannot be ignored." Bruton, 391 U.S. at 135-136. See also Cruz v. New York, 481 U.S. 186, 193 (1987)

28  (limiting instructions as to admissions of non-testifying co-defendant implicating defendant not adequate even

where the defendant's own confession is admitted against him).

Accordingly, this Court should sever Mr. Motivosyan' trial from that of the other defendants in order to preserve Mr. Motivosyan' rights under the Confrontation Clause.

**B.     This Court Should Sever the Trials Because it is Anticipated that the Defendants Will Offer Mutually Exclusive Defenses.**

Severance may be granted where the defendant "shows that the core of the co-defendant's defense is so irreconcilable with the core of his own defense that the acceptance of the co-defendant's theory by the jury precludes acquittal of the defendant." United States v. Throckmorton, 87 F.3d 1069, 1072 (9th Cir. 1996).

The Ninth Circuit has recognized that "'[t]he prototypical example is a trial in which each of two defendants claims innocence, seeking to prove instead that the other committed the crime.'" United States v.Tootick, 952 F.2d 1078 (9th Cir. 1991)(citing United States v. Holcomb, 797 F.2d 1320, 1324 (5th Cir. 1986). Mutual exclusivity also may exist when "only one defendant accuses the other, and the other denies any involvement." Tootick, 952 F.2d at 1081 (citing United States v. Romanello, 726 F.2d 173, 177 (5th Cir. 1984)); see also United States v. Mayfield, 189 F.3d 895 (9th Cir. 1999).  For example, in Tootick, co-defendants Mr. Tootick and Mr. Frank each claimed that the other acted alone in stabbing Mr. Hart, the victim. Tootick, 189 F.3d at 1081. There was no dispute that all three men were present at the scene, and that Mr. Hart did not injure himself.  Id.  Mr. Frank testified that he watched in horror as Mr. Tootick stabbed Mr. Hart.  Id.  Mr. Tootick, who did not testify, presented a defense that he passed out or was asleep throughout the episode.  Id. Thus, their defenses contradicted each other such that "the acquittal of one necessitat[ed] the conviction of the other."  Id.   The joint trial resulted in substantial prejudice to both defendants because their mutually exclusive defenses prevented the jury from determining the "guilt or innocence of each defendant on an individual and independent basis." Id. at 1082.  The Ninth Circuit held that the district court abused its discretion in refusing to sever, and  reversed both defendants' convictions.

**VI.**

**THE COURT SHOULD SUPPRESS MR. MOTIVOSYAN'S ALLEGED STATEMENTS**

**A.  _Miranda_ Warnings Must Precede Custodial Interrogation.**

The Supreme Court has held that the government may <u>not</u> use statements, whether exculpatory or inculpatory, obtained during custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). The law imposes no substantive duty upon the accused to make any showing other than that the statements were taken while the accused was in custody and subject to interrogation. <u>Id.</u> at 476. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of her freedom of action in any significant way. <u>Id.</u> at 477; <u>see also</u> <u>Orozco v. Texas</u>, 394 U.S. 324, 327 (1969). In <u>Stansbury v. California</u>, 511 U.S. 318 (1994), the Court stated, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Id.</u> at 323.

When it takes an accused's statement during custodial interrogation, a heavy burden rests on the government to demonstrate that the accused intelligently and voluntarily waived his privilege against self-incrimination. To satisfy this burden, the prosecution must introduce evidence sufficient to establish "that under the 'totality of the circumstances,' the defendant was aware of 'the nature of the right being abandoned and the consequences of the decision to abandon it." <u>United States v. Garibay</u>, 143 F.3d 534, 536 (9th Cir. 1998) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)). The Ninth Circuit has stated that "[t]here is a presumption against waiver." <u>Garibay</u>, 143 F.3d at 536. The standard of proof for a waiver of constitutional rights is high. <u>Miranda</u>, 384 U.S. at 475; <u>see also</u> <u>United States v. Heldt</u>, 745 F.2d 1275, 1277 (9th Cir. 1984) (the burden on the government is great, the court must indulge every reasonable presumption against waiver of fundamental constitutional rights) (citing <u>Johnson v. Zerbst</u>, 304 US 458, 464 (1938)). Finally, it should be noted that, since <u>Miranda</u> rests on a constitutional foundation, <u>see</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 438 (2000), no law or local court rule relieves the government of its burden to prove that Mr. Motivosyan voluntarily waived the <u>Miranda</u> protections.

Miranda, 384 U.S. at 475.

The validity of the waiver depends upon the particular facts and circumstances of the case, and include the background, experience, and conduct of the accused.  Edwards v. Arizona, 451 U.S. 477, 482 (1981); Johnson v. Zerbst, 304 U.S. 458, 464 (1938); see also Garibay, 143 F.3d at 536; United States v. Bernard S., 795 F.2d at 751 ("a valid waiver of Miranda rights depends upon the totality of the circumstances, including the background, experience and conduct of the accused").  In Derrick v. Peterson, 924 F.2d 813 (9th Cir. 1990), the Ninth Circuit confirmed that the issue of the validity of a Miranda waiver requires a two prong analysis: the waiver must be both (1) voluntary; and, (2) knowing and intelligent.  Id. at 820.  The voluntariness prong of this analysis "is equivalent to the voluntariness inquiry [under] the [Fifth] Amendment . . . ."  Id.  The knowledge prong mandates an inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  Id. (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)); accord Garibay, 143 F.3d at 436.  Thus, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."  Derrick at 820 (quoting Moran v. Burbine, 475 U.S. at 521) (emphasis in original) (citations omitted)).

Here, Mr. Motivosyan was in custody once he was stopped in his car and again once he was stopped on the street.  Unless and until it shows the agents properly administered the Miranda warnings and obtained a knowing and intelligent waiver from Mr. Motivosyan, the government cannot use evidence obtained as a result of any custodial interrogation that occurred after Mr. Motivosyan's arrest.  Miranda, 384 U.S. at 479.

**B.  The Government Bears the Burden of Proving that Mr. Motivosyan's Alleged Statements Were Made Voluntarily**

Even when the procedural safeguards of Miranda have been satisfied, a defendant in a criminal case is deprived of due process of law if his conviction is founded upon an involuntary confession. Arizona v. Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964).  The government bears the burden of proving that a confession is voluntary.  Lego v. Twomey, 404 U.S. 477, 483 (1972).

In order to be voluntary, a statement must be the product of a rational intellect and free will. Blackburn v. Alabama, 361 U.S. 199, 208 (1960).  In determining whether a defendant's will was overborne in a particular case, this Court must consider the totality of the circumstances.  Schneckloth at 226; see also United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir. 1993).  A statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence."  Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)); see also United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981).

To meet its burden, the government must demonstrate that Mr. Motivosyan's statement was not the result of either threats or promises made by the agents, but was made voluntarily.

**C.  This Court Must Conduct An Evidentiary Hearing.**

Accordingly, this Court must conduct an evidentiary hearing to determine whether the government can meet this burden and use Mr. Motivosyan's statements against him.  18 U.S.C. § 3501. Since "'suppression hearings are often as important as the trial itself,'" these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.  See United States v. Prieto-Villa, 910 F.2d 601, 609-10 (9th Cir. 1990) (quoting Waller v.

Georgia, 467 U.S. 39, 46 (1984)).

Unless and until the government demonstrates that statements were made voluntarily, the statements may not be used for any purpose at trial.

## VII.

## MOTION FOR LEAVE TO FILE FURTHER MOTIONS

Mr. Motivosyan requests the opportunity to file further motions and/or supplement the motions already filed after reviewing additional discovery and conducting independent investigation.

## VIII.

## CONCLUSION

For the foregoing reasons, Mr. Motivosyan respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated:  June 16, 2008

 /s/ Jodi Thorp
JODI THORP
Counsel for Mr. Motivosyan